### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ARNOLD B. WEISS, et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:07-cv-1019 (RJL)** |
| | ) | |
| **NIKE, INC., a/k/a NIKE USA, INC., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### DEFENDANTS NIKE, INC. AND EASTBAY, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR PROTECTIVE ORDER TO QUASH SUBPOENAS

Defendants Nike, Inc. ("Nike") and Eastbay, Inc. ("Eastbay"), by counsel and pursuant to Fed. R. Civ. P. 45, hereby file their Opposition to Plaintiffs' Motion for Protective Order to Quash Subpoenas.

## I.    BACKGROUND AND INTRODUCTION

This is a products liability case filed by plaintiff Arnold Weiss ("Weiss") and his wife Silvia Lattova ("Lattova") (collectively "Plaintiffs"). Weiss alleges, *inter alia*, that there were design and manufacturing defects to the Nike shoes he was wearing on June 27, 2004. Weiss claims that his Achilles tendon tore in a "pick-up" basketball game as a result of the shoes. Plaintiff Weiss claims personal injuries and lost wages, as well as loss of consortium, and plaintiff Lattova claims loss of consortium and solatium.

Plaintiffs have moved to quash the subpoenas which have been issued on behalf of Nike and Eastbay for the employment and educational records of Lattova. The subpoenas should not be quashed, since plaintiff Lattova has made these records relevant. Lattova claims that, as a result of the accident involving Weiss, she received worse grades in law school than she would have otherwise received since she had to care for her

husband. She also claims that she could not go to a "better" law school out of the local area because she had to stay with her husband, and that could not go to law school full time because of her husband's injury. Lattova further claims that her future prospects for more income and better employment have consequently been damaged.

## II.    ARGUMENT

The subpoenas seek relevant information pertaining to the claims and defenses at issue, and should not be quashed. Moreover, plaintiff has waived any alleged privacy issue due to the damages she claims in her discovery responses and in her deposition. Additionally, pursuant to Fed. R. Civ. P. 45, Plaintiffs' do not have standing and their motion is not timely. Several subpoena responses have already been received prior to any Motion being filed, which have been copied to Plaintiffs' counsel.

### A.    Plaintiff Lattova has made her employment and educational history relevant.

Both Weiss and Lattova assert claims for loss of consortium. Such a claim has included love, affection, advice, and counsel, as well as material support. See Hitaffer v. Argonne Co., 183 F.2d 811, 819 (D.C. Cir. 1950); see also Curry v. Giant Food Co., 522 A.2d 1283, 1294 (D.C. 1987) (" 'consortium' consists not only of material services, but also affection, companionship, sexual relations, and the customary amenities of married life."). Lattova served sworn Answers to Interrogatories which made her educational and employment background relevant to the claims and defenses. Her Answers to Nike's Interrogatories are attached hereto as Exhibit A.

For example, in response to Nike's Interrogatory No. 8, which inquired as to whether Lattova is making a claim for lost income, Lattova claims that she could not go to a "better" law school out of the area due to her husband's injury, since she claims that

2

she had to care for him and that he could not work.  In response to Nike's Interrogatory

No. 12, which asked whether Lattova claimed any permanent injuries/damages, Lattova

claims that she will make less money when she finishes law school because she was

unable to go to a "better" law school allegedly due to the incident and she allegedly did

not get "good" grades in law school due to the incident.  Lattova responded to Nike's

Interogatory No. 13, which asked for an itemization of her damages, by referring back to

her other answers to No. 9 (concerning her physical injuries as a result of the incident)

and No. 12 which is discussed above.

Lattova also testified in her deposition, at pages 28 to 29, as follows:

Q    . . . Are you intending by that answer [to Interrogatory No. 8] to
suggest that if it had not been for your husband's accident that you would
have gone to a different law school and ended up with a different career
path?

A    I certainly would have ended up with a different career path and
most likely with a different income had I gone to at [sic] that ranked law
school.  This is the unfortunate fact.  This is a fact because if you graduate
from Columbia obviously you are going to be hired by a more prestigious
firm and gaining – you know, making more money in the future is just a
fact of life.

Q    Is that a claim that you're actually making in this case though?

A    I think that, you know, had it – had I been in a better – had we
been in a better financial position I wouldn't have had to take that into
consideration in making my decision into what law school to go.  My
husband at the time was still not making enough money was – it would
have been a big risk for me to move outside of Washington, D.C., where I
already had a job which was well paid.  So I couldn't have – there was no
certainty that, first of all, even moving outside of this area I wouldn't have
been able to secure a job where I could have drawn a salary.  Furthermore,
neither of those universities have evening programs, so that wouldn't have
been a possibility.

(See Exhibit B, portions of deposition of Silvia Lattova).

Ms. Lattova's Interrogatory Answers and her deposition testimony show that she and/or her husband are seeking damages to her educational and employment opportunities as a result of the alleged incident involving her husband.

Pursuant to Fed.R.Civ.P. 26(b)(1), a party is entitled to discover "any non-privileged matter that is relevant to the claim or defense of any party." Such relevant information need not be admissible if it is "reasonably calculated to lead to the discovery of admissible evidence." Id. "Relevance for discovery purposes is broadly construed." Washington v. Thurgood Marshall Academy, 230 F.R.D. 18, 21 (D.D.C. 2005). The party moving to limit discovery by protective order "must establish good cause 'by demonstrating the specific evidence of the harm that would result.'" Id. (citation omitted). The person moving for a protective order or to quash a subpoena has the burden, and it is a "heavy burden of showing 'extraordinary circumstances' based on 'specific facts' that would justify such an order." Id., quoting Alexander v. F.B.I., 186 F.R.D. 71, 75 (D.D.C. 1998). Plaintiffs have shown no such "extraordinary circumstances" or "specific evidence" of any harm.

In Washington, one issue that was decided concerned subpoenas issued by defendant Thurgood Marshall Academy to plaintiff's other employers. Washington, 230 F.R.D. at 24. Plaintiff filed a motion to quash the subpoenas and a motion for protective order. Id. Plaintiff did not assert any grounds for standing in its motion to quash and as such, the court analyzed plaintiff's motion in accordance with Rule 26(c) for protective orders. Id. The court determined that the Thurgood Marshall Academy sought records from plaintiff's employers for a number of reasons, including information concerning plaintiff's duties and responsibilities at her current position and to determine whether she

4

voluntarily terminated her position at a particular time. Id. The information was relevant for multiple reasons, and also the information could be used as impeachment since "specific prior inconsistent may be used to impeach a witness on cross-examination." Id. The court found that the documents requested were reasonably calculated to lead to admissible evidence and that plaintiff was not entitled to a protective order. Id.

In the present case, defendants Nike and Eastbay are entitled to discover information that may refute or test Lattova's claims. Defendants are entitled to subpoena the records from the various educational institutions to determine whether Lattova was even accepted at these other possible law schools, whether her grades ever suffered from the alleged incident with Weiss and if they improved after he recovered. Defendants are also entitled to Lattova's employment records, since she is alleging that her future employment opportunities have been damaged allegedly due to the incident involving Weiss. The employment records may show that Lattova's future employment opportunities may be limited by her prior performance, not by any incident involving Weiss. The subpoenas seek relevant and discoverable information.

### B.    Plaintiffs Do Not Have Standing and Plaintiffs' Motion is Not Timely Under Rule 45

Plaintiffs have filed, pursuant to Rule 45, their Motion for Protective Order to Quash Subpoenas that were issued on behalf of defendants for employment and educational records of plaintiff Lattova. "A party generally lacks standing to challenge a subpoena issued to a third party absent a claim of privilege, proprietary interest, or personal interest in the subpoenaed matter. A motion to quash, or for a protective order, should generally be made by the person from whom the documents or things are requested." Washington, 230 F.R.D. at 21 (internal citations omitted). Plaintiff Weiss

has no standing to claim any privilege in his wife's records. Moreover, Plaintiff Lattova has waived any privilege if any privilege existed.

In Washington, plaintiff sued her former employer, a D.C. charter school, and issued subpoenas duces tecum to on two non-parties, (1) the entity hired by the school to manage its special education program and (2) D.C. Public Schools. Washington, 230 F.R.D. at 20-21. Thereafter, defendant filed motions to quash the subpoenas on grounds relevance and possible infringement of privacy rights of the non-parties. Id. at 21. However, none of the non-parties challenged the subpoenas. Id. at 22. The Court concluded that the defendant had no standing to seek to quash the subpoenas and defendant claimed no privilege or interest in the subpoenaed information. Id.

The Court in Washington cited the decision in Chiperas v. Rubin, 1998 WL 765126 (D.D.C. 1998) (attached hereto as Exhibit C) concerning the standing issue. Washington, 230 F.R.D. at 21. In Chiperas, the defendant had issued a subpoena duces tecum to a doctor, who conducted a psychological evaluation of plaintiff, requesting copies of all raw data and test results of plaintiff. Id. at *1. The Court in Chiperas found that plaintiff could claim no privilege to the raw data and that any privilege was waived by offering the doctor as a witness. Id. *2. Consequently, plaintiff had no standing to quash the subpoena. Id. The court went on to state that even if standing was established, "events have overtaken his claim of privilege" because defendant retained an different expert to evaluate the raw data sought. Id.

Likewise, in this case, Lattova has made claims regarding damages to her employment prospects and her law school prospects. These "events" have "overtaken" any claim of privilege. She has therefore waived any privilege, and lacks any standing

6

under Fed. R. Civ. P. 45.  As such, if the motion is considered, it should be under Rule 26, as discussed above.

In this case, there have been no Motions to Quash filed by the non-parties; only one entity (Salans law firm) filed an objection indicating that it would produce the documents concerning Lattova subject to a protective order that would only allow the documents to be used for purposes of this litigation (See attached Exhibit D).

Even assuming *arguendo* that Plaintiffs do have standing under Rule 45, as they are not non-parties, Plaintiffs' Motion was not timely under Rule 45.  Some responses had already been received by the time Plaintiffs filed their Motion, and copies of those responses have been provided to Plaintiffs' counsel.  Moreover, any objection to a subpoena must be filed with 14 days after service of the subpoenas.  Fed. R. Civ. P. 45(c)(2)(B).  The subpoenas were served upon Plaintiffs' counsel on June 13, 2008, and Plaintiffs' July 9, 2008 Motion was too late.

### III.    CONCLUSION

WHEREFORE, defendants respectfully request that this Honorable Court DENY Plaintiffs' Motion for Protective Order to Quash the subpoenas, and order the subpoenaed entities to comply with the subpoenas within 10 days of the date of this Court's Order.

NIKE, INC. AND EASTBAY, INC.

By:     ____/s/ David D. Hudgins_____
        Counsel

7

David D. Hudgins, Esquire (DC Bar #362451)
Robert E. Draim, Esquire (admitted *pro hac vice*)
Debra S. Stafford, Esquire (DC Bar #979137)
HUDGINS LAW FIRM, P.C.
515 King Street, Suite 400
Alexandria, Virginia  22314
(703) 739-3300 telephone
(703) 739-3700 facsimile

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 16th day of July 2008, a true copy of the foregoing was filed using the CM/ECF system which will send notification of such filing to the following:

Prabir Chakrabarty, Esquire
RESNICK & SCHWARTZMAN, L.L.C.
One East Franklin Street, Suite 200
Baltimore, Maryland 21202
pc@rs-atty.com

and a true copy of the foregoing was sent via first class mail postage pre-paid to:

Robert M. Schwartzman, Esquire (admitted *pro hac vice*)
RESNICK & SCHWARTZMAN, L.L.C.
One East Franklin Street, Suite 200
Baltimore, Maryland 21202

                                    ___/s/ David D.Hudgins_____
                                    Counsel

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **ARNOLD B. WEISS, et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:07-cv-1019 (RJL)** |
| | ) | |
| **NIKE, INC., a/k/a NIKE USA, INC., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

UPON CONSIDERATION of Plaintiffs' Motion for Protective Order to Quash Subpoenas and the Opposition of Defendants Nike, Inc. and Eastbay, Inc.; it is hereby

ORDERED that the Motion is DENIED; and it is

ORDERED that documents requested by defendants Nike and Eastbay in the subpoenas issued to Georgetown University, Slavic Languages Department; Georgetown University, School of Foreign Service; U.S. English Foundation; Salans; Columbia Law School; University of Pennsylvania Law School; George Mason University Law School; are found by this Court to be discoverable in the instant proceeding; and it is

ORDERED that the above-referenced subpoenaed entities shall comply with the subpoenas within 10 days of the date of this Order by providing the documents requested; and it is

ORDERED that the documents produced in response to the above-referenced subpoenas may be used only for purposes of this litigation.

SO ORDERED.

_____
Honorable Richard J. Leon,
United States District Judge

cc:

David D. Hudgins (D.C. Bar # 362451)
Robert E. Draim (admitted *pro hac vice*)
Debra S. Stafford, Esquire (DC Bar #979137)
Hudgins Law Firm, P.C.
515 King Street, Suite 400
Alexandria, VA  22314

Prabir Chakrabarty, Esq. (Fed. Bar #25524)
Robert M. Schwartzman, Esq. (admitted *pro hac vice*)
Resnick & Schwartzman, L.L.C.
One East Franklin Street, Suite 200
Baltimore, Maryland 21202

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ARNOLD B. WEISS, et al             *

          Plaintiffs          *

     v.                       *     Case No. 1:07-cv-1019

NIKE, INC., a/k/a NIKE USA, INC., et al   *

          Defendants       *

\*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

### PLAINTIFF SILVIA LATTOVA'S ANSWERS TO INTERROGATORIES PROPOUNDED BY DEFENDANT NIKE, INC.

Comes now the Plaintiff, Silvia Lattova, by and through her attorneys, Robert M. Schwartzman, Esquire, Prabir Chakrabarty, Esquire and Resnick & Schwartzman, L.L.C., and for Answers to Interrogatories propounded by the Defendant, Nike, Inc. a/k/a Nike USA Inc., and states as follows:

(A) The information supplied in these Answers is not based solely upon the knowledge of the executing party, but includes the knowledge of the party's agents, representatives, and attorneys, unless privileged.

(B) The word usage and sentence structure is that of the attorneys, who, in fact, prepared these Answers and the language does not purport to be the exact language of the executing party.

(C) The Interrogatories have been interpreted and answered in accordance with the Maryland Rules of Procedure, plain English usage, and to the extent not specifically challenged by objection, the definitions and instructions included with the Interrogatories.

INTERROGATORY NO. 1: State your full name, including any alias or nickname ever used, residential address and phone number for the past ten years, date of birth social security

EXHIBIT
A

number, height, weight, shoe size, occupation and work address and telephone number for the

past ten years, name of your work supervisor for the past ten years, formal education including

the institutions attended and the last level of schooling completed, your marital status; and

identify all persons who furnished information or participated in any way in preparing your

responses to these Interrogatories.

ANSWER TO INTERROGATORY NO. 1:

Silvia Lattova
Ms. Lattova's DOB: ████/1969
Her Social Security Number is ████3787

Ms. Lattova's previous addresses were:
1792 Clovermeadow Drive
Vienna, Virginia    22182-1877
and
2700 16th Street South #650
Arlington , VA , 22204

Ms. Lattova's current address is:
2712 Wisconsin Ave, NW , 906
Washington , DC 20007

Ms. Lattova's present occupation:

Law Student
George Mason University
3301 Fairfax Drive
Arlington , VA 22201

From May 2003-May 2007 she was employed at:
U.S. English Foundation
Director of Special Programs
1747 Pennsylvania Ave ; NW, Ste. 1050
Washington , DC 20006
202-833-0100

From 1998-2005 she was employed as an Independent Consultant at:
Georgetown University
Slavic Languages Department
Lecturer
Chair: Marcia Morris

Department of Slavic Languages at Georgetown University
Department of Slavic Languages
Box 571050
Intercultural Center 307 A-H
Washington, DC 20057-1050

From 2003 to present she has been employed as
Vice President
New Alliance Media Group
2712 Wisconsin Ave, NW, Ste. 906
Washington , DC 20007

Ms. Lattova's educational background is:

George Mason University, Arlington, VA (3L) at present
JD International Business Transactions Law track expected December 2008

Oxford, New College, *Oxford,* United Kingdom                              Fall 2007

Cambridge University, Emmanuel College, *Cambridge*, United Kingdom  Summer 2006

Georgetown University, Edmund A. Walsh School of Foreign Service, Washington, DC
MA: Russian, Central and Eastern European and Eurasian Studies          May 1997

Volgograd State University, Volgograd, Russian Federation
BA/MA Double Major: *Russian* Language & Literature, *English*; Minor: German   June 1992

Ms. Lattova and Mr. Weiss were married April 12, 1996.

My attorneys participated in responding to these interrogatories.

        INTERROGATORY NO. 2:  Identify all persons and/or eyewitnesses, (providing an

address at which each may be served with a deposition or trial subpoena and a telephone

number), having personal knowledge of any facts alleged in your Complaint and/or likely to

have discoverable information, and describe the subjects of the information and/or knowledge

you believe each possesses.

        ANSWER TO INTERROGATORY NO. 2:  Ms. Lattova has no knowledge with respect

to eyewitnesses.  Other persons with knowledge include:

Jason Bohrer
3006 Aquia Drive
Stafford , VA 22554
540-659-2826

Mr. Bohrer is a classmate in the night program at George Mason Law School; Ms. Lattova shared with him the difficulties of trying to manage school, work full time and take care of her sick husband; she mentioned their financial problems resulting from the injury, the stress she was under, and to a certain degree, their marital problems.

Dorota Majewska
3828 155th Ave ; SE
Bellevue, WA 98006

Ms. Majewska is Ms. Lattova's best friend; she shared with Ms. Majewska the difficulties of trying to manage school, work full time and take care of her sick husband; she mentioned their financial problems resulting from the injury, the stress she was under, and their problems with intimacy.

Sheila Weiss is Mr. Weiss' mother.  Ms. Lattova shared with Ms.Weiss the difficulties of trying to manage school, work full time and take care of her sick husband; she mentioned their financial problems resulting from the injury, the stress she was under, and to a certain degree, their marital problems.

Anna Latova
Pcoline 256
067 35 Slovak Republic
+011-421-5776-95224

Anna Lattova is Ms. Lattova's mother.  Ms. Lattova shared with her mother the difficulties of trying to manage school, work full time and take care of her sick husband; she mentioned their financial problems resulting from the injury, the stress she was under, and to a certain degree, their marital problems.

Juliana Venturi Fair
3830 9th Street, Apt. 106W
Arlington, VA 22203

Juliana Venturi Fair is Ms. Lattova's yoga instructor. Ms. Lattova shared with Ms. Venturi the difficulties of trying to manage school, work full time and take care of her sick husband; she mentioned their financial problems resulting from the injury, the stress she was under, and to a certain degree, their marital problems.

INTERROGATORY NO. 3:  Identify all expert witnesses who may be called or used at trial to present testimony and/or evidence on your behalf.

ANSWER TO INTERROGATORY NO. 3:  Plaintiff's Expert Designation will be provided in accordance with the Court's Scheduling Order.  Refer to the Expert Designation for Plaintiff's complete response to this Interrogatory.

INTERROGATORY NO. 4:  For each expert listed in your Answer to the previous Interrogatory, state the opinions to be expressed by each expert witness and the basis and reasons therefore, the data and/or other information considered in forming their opinions, any exhibits to be used as a summary of or support for the opinions, the qualifications of each expert witness including a list of all publications authored within the preceding 10 years, the compensation to be paid for the study and testimony; and a listing of any other cases which each expert witness has testified as an expert at trial or by deposition within the preceding four years.

ANSWER TO INTERROGATORY NO. 4:  Plaintiff's Expert Designation will be provided in accordance with the Court's Scheduling Order.  Refer to the Expert Designation for Plaintiff's complete response to this Interrogatory.

INTERROGATORY NO. 5:  Identify any and all documents encompassed by Defendant's Request for Production of Documents, but withheld by you for any reason.  For each document so withheld, provide a privilege log, stating the nature of your objection or claim of privilege, the name and address of the custodian of each document, and describe each such document including the date.

ANSWER TO INTERROGATORY NO. 5:  Plaintiff is unaware of any privilege log.  However, discovery is ongoing and if such information should be discovered, a Supplemental Discovery response will be provided.

INTERROGATORY NO. 6:  If you contend that defendant Nike and/or defendant Eastbay, Inc. ("Eastbay") has ever made any acknowledgement, admission of liability, or declaration you contend was made, identify the person making the acknowledgement, admission, or declaration and any witness(es) thereto, and the date, time and location of each such acknowledgement, admission or declaration, and provide a copy of such statement if it is written or recorded by any means (whether physically or digitally or electronically).

ANSWER TO INTERROGATORY NO. 6:  Ms. Lattova has no personal knowledge of any such admission against interest.  But discovery is ongoing and if such admissions should be discovered, a Supplemental Discovery Response will be provided.

INTERROGATORY NO. 7:  State whether or not you gave any statement, written or recorded or oral, to anyone other than your attorney concerning any of the events set forth in the allegations of your Complaint.  If you have made any such statement(s), specify the date of the statement(s), to whom given, identify the person or individual or firm or corporation currently in possession of the statement(s) and attach a copy of such statement if it is written or recorded by any means (whether physically or digitally or electronically).

ANSWER TO INTERROGATORY NO. 7:  Ms. Lattova is unaware of any such statements. However, discovery is ongoing and if such statements should be discovered, a Supplemental Discovery Response will be provided.

INTERROGATORY NO. 8:  State whether you claim any loss of income or earnings as a result of the incident and/or any allegations made in your Complaint, and if so, state the dates and time lost on each date, the total time claimed to have been lost from gainful employment, the monetary amount of loss of wages, income or earnings claimed, and the manner or method used to determine same.  Attach all documents that support your answer.

ANSWER TO INTERROGATORY NO. 8:  Due to the severity of Mr. Weiss' injury and consequent financial loss, though Ms. Lattova wanted to go to a law school outside of the area of the District of Columbia, her financial situation prevented her from seriously considering a law school outside of this area.  Further, she had to stay in the District of Columbia area in order to care for Mr. Weiss.  Ms. Lattova was on the wait list for University of Pennsylvania and Columbia, but given Mr. Weiss' loss of income and his need for personal care, Ms. Lattova knew that she could not afford to move, so she could not pursue these educational opportunities.

INTERROGATORY NO. 9:  State the nature, extent, symptoms and complaints of personal injuries and all other injuries and/or damages claimed by you to have been suffered as a result of the incident.  Attach all documents supporting your answer.

ANSWER TO INTERROGATORY NO. 9: Ms. Lattova experienced severe stress including: taking care of her husband, working full time, and going to law school.  Ms. Lattova eventually developed insomnia, the sleep deprivation eventually led to difficulty concentrating.  Ms. Lattova also suffered gastro-intestinal problems.  As a consequence of the problems caused by Mr. Weiss' injury, Mr. Weiss and Ms. Lattova eventually had to see a marriage therapist.

Mr. Weiss' injury and the resulting physical inactivity led to severe mood swings that put a great amount of stress on both he and Ms. Lattova.  Mr. Weiss' injury still prevents them from spending time together and doing things that they enjoyed before the injury, such as walking, which is Ms. Lattova's favorite past time.  As Mr. Weiss can't walk for more than a few blocks before experiencing considerable discomfort, he can no longer spend mornings together going for a cup of coffee or breakfast, which he and Ms. Lattova used to do regularly on weekends.  Daily he experiences discomfort while relaxing, which is helped only by Silvia rubbing his feet and elevating them for an extended period of time.

Mr. Weiss's injuries have made him very uncomfortable not only during the day, but also at night. Ms. Lattova has to massage his leg regularly before bed; Mr. Weiss is even now unable to find comfort at night, which leads to him tossing and turning and waking Ms. Lattova up at night. Mr. Weiss often has to sleep in the other room, as his constant discomfort leads to disturbing her nightly rest. This encroaches on any intimacy between Ms. Lattova and Mr. Weiss.

For an extended period of time, due to Mr. Weiss' severe pain, the injury prevented any relations of intimate nature, which put a further strain on the relationship and led to marital problems as a result of which they sought the services of a marriage therapist.

Mr. Weiss had to spend a lot of time in physical therapy, and Ms. Lattova had to part with him for months while he was in Florida completing his physical therapy.

INTERROGATORY NO. 10: State the names and addresses of all doctors, practitioners, therapists, mental health care providers, nurses, hospitals, clinics, other institutions, other medical providers, other health care providers, and/or any other providers including but not limited to natural or alternative or holistic care providers who rendered services for examination and/or diagnosis and/or evaluation and/or analysis and/or treatment of any injuries incurred or allegedly sustained as a result of the incident in question. Include the dates of such consultations, examinations or treatments and the itemized charges for such services, or attach copies of any and all statements/bills for services rendered and all records and reports from such providers.

ANSWER TO INTERROGATORY NO. 10: Ms. Lattova objects to Interrogatory No. 10 based upon relevance, given that Ms. Lattova has not made any claim for physical or mental injuries.

INTERROGATORY NO. 11: Identify all doctors, practitioners, therapists, mental health care providers, nurses, hospitals, clinics, other institutions, other medical providers, other health care providers, and/or any other providers including but not limited to natural or alternative or holistic care providers (hereinafter "Providers"), who rendered services for examination and/or diagnosis and/or evaluation and/or analysis and/or treatment or who rendered any services to you for any medical or mental condition, in the past ten years.

ANSWER TO INTERROGATORY NO. 11: Plaintiff objects to this Interrogatory based on relevance given that Ms. Lattova has not made any claim for physical injuries.

INTERROGATORY NO. 12: If you claim that any of your injuries and/or damages are permanent, set forth in detail the nature of such permanency, the disability claimed to result therefrom and the percentage (if one has to be determined), and identify the Providers making such prognosis including the Provider's specialty.

ANSWER TO INTERROGATORY NO. 12: Ms. Lattova and Mr. Weiss have experienced permanent damage to their marital relations, due to the excessive stress caused by Mr. Weiss' injuries. Additionally, although Ms. Lattova wanted to go to a law school outside of the District of Columbia area, Mr. Weiss' financial situation and his need for care prevented Ms. Lattova from seriously considering a law school outside of the area. Ms. Lattova was on the wait list for University of Pennsylvania and Columbia, but given her financial situation, Ms. Lattova knew that she could not afford to move so she could not pursue these opportunities. Even if she worked and made more money, she could not leave Mr. Weiss who required constant care.

Ms. Lattova had a full-time job in the District of Columbia, she had to take care of her husband and was taking 12 credits per semester, the stress of all of these responsibilities negatively impacted her grades and she was unable to transfer to a better ranked law school. That

has led to a considerable disadvantage looking for summer jobs and will have an impact on Ms. Lattova's future financial opportunities.

INTERROGATORY NO. 13:  Set forth a detailed itemization and computation of all categories of your claimed damages.  Attach copies of all bills, receipts and documentation, not privileged, supporting or upon which your computation is based.

ANSWER TO INTERROGATORY NO. 13:  See Answer to Interrogatories No. 9 and 12.

INTERROGATORY NO. 14:  State whether you have ever been injured, treated or hospitalized as a result of trauma, accident, or any other cause ten years prior to the incident giving rise to this litigation and any time subsequent to the incident; and if so, as to each such occurrence, state the date and place, a description of the evident, a description of all injuries sustained, identify all persons involved in the event causing such injuries, and identify Providers who rendered services for examination and/or diagnosis and/or evaluation and/or analysis and/or treatment of such injuries.

ANSWER TO INTERROGATORY NO. 14:  Plaintiff objects to this Interrogatory based upon relevance, given that Ms. Lattova has not made claim for physical injuries.

INTERROGATORY NO. 15:  If all or part of your claim is that a pre-existing injury, illness, disease or condition has been aggravated, accelerated or exacerbated as a result of the incident, describe the pre-existing injury or condition and the nature and the extent to which it has been aggravated, accelerated or exacerbated; identify all Providers who have rendered services for examination and/or diagnosis and/or evaluation and/or analysis and/or treatment for such pre-existing injury or condition; state the date of onset of such pre-existing injury or condition; and state the original cause of such pre-existing injury or condition.

ANSWER TO INTERROGATORY NO. 15:  No such claim is made.

INTERROGATORY NO. 16:  State whether you have ever made a claim and/or have any claims pending against anyone for damages or personal injury or property damage or workers' compensation; and if so, provide the names and addresses of the parties against whom such claim is or has been asserted, the date such claim arose and description of and location of the occurrence giving rise to such claim; and if any such claims resulted in litigation, identify the court or administrative forum or other forum where such actions were brought including the style of the case and the file/case number.

ANSWER TO INTERROGATORY NO. 16:  No such claims have been made.

INTERROGATORY NO. 17:  State your physical condition and general health prior to the incident, including any impairments, illnesses, diseases, defects or disabilities, whether organic, congenital or traumatic origin; and whether you were, at the time of the incident, under the regular care of any Provider; and if so, identify such Providers and state whether you were taking any medication at the time of the incident.

ANSWER TO INTERROGATORY NO. 17:  Plaintiff objects to this Interrogatory based upon relevance, given that Ms. Lattova has not made claim for physical injuries.

INTERROGATORY NO. 18:  Identify any and all learned treatise(s), including but not limited to medical, physiological, or bio-mechanical treatises, that you and/or your expert witnesses consider to be authoritative concerning the allegations and/or damages and/or injuries claim in your Complaint, including the name of the treatise(s), the author(s), and the relevant page numbers of each such treatise.

ANSWER TO INTERROGATORY NO. 18:   Plaintiff will supply Expert Witness Designation, reports, etc., in compliance with the Court's Scheduling Order for Expert Designation.

INTERROGATORY NO. 19:   State all facts supporting your allegations in your Complaint concerning Count XII – Loss of Consortium and Solatium (Nike, Inc.), including but not limited to your allegations that Nike's acts or omissions were wrongful, reckless or negligent and explain/describe what activities you allegedly could not do.

ANSWER TO INTERROGATORY NO. 19:  Please refer to Answer to Interrogatory No. 9.

INTERROGATORY NO. 20:  Describe in detail the incident including a description of the events in the twenty-four hours prior to the incident, during the incident, and the twenty-four hours after the incident.

ANSWER TO INTERROGATORY NO. 20:  Plaintiff objects to this Interrogatory based upon relevance.  However, without waiving said objection, Ms. Lattova dropped off Mr. Weiss at the Georgetown University Student Center, and later went to the hospital after she was informed of his injury.

INTERROGATORY NO. 21:  Describe and identify what substances (including but not limited to any legal or illegal or prescription or non-prescription drugs or medications or substances or alcohol or supplements) you consumed, took, used, injected, drank, smoked, inhaled, ingested or absorbed in any way, in the two weeks prior to the incident.  Include the name of the substances, the dosage and the frequency, and identify the prescribing Provider if any.

ANSWER TO INTERROGATORY NO. 21: Plaintiff objects to this Interrogatory based upon relevance, given that Ms. Lattova has not made any claim for physical injuries.

INTERROGATORY NO. 22: State whether you have ever been convicted of a felony or a crime involving moral turpitude. If so, please state the nature of said conviction and the date and place thereof.

ANSWER TO INTERROGATORY NO. 22: Plaintiff objects to this Interrogatory based on relevance. However, without waiving said objection, none.

INTERROGATORY NO. 23: State whether you or anyone on your behalf discussed the product and/or the subject product and/or the incident with any defendant or representative of any defendant at any time prior to or after the incident; and if so, state when, where and the content of statements made by the defendant or any representative of the defendant. Include in your answer the identity of the person(s) involved and all witnesses, and the date, time and location of each such discussion, and provide a copy of any such discussion if it is written or recorded by any means (whether physically or digitally or electronically).

ANSWER TO INTERROGATORY NO. 23: Ms. Lattova has not had any discussions with Defendants.

INTERROGATORY NO. 24: State whether you have or anyone else has inspected, examined, tested, or photographed the subject product, or photographed Plaintiff Weiss before, during or after the incident. If so, for each inspection, examination, test or photo, identify the person(s) making the inspection, examination, test or photographs and the date and time of such inspection, examination, test or photograph. Attach a copy of all reports, documents and photographs relating to such inspection, examination or test, and attach a copy of all such photographs.

ANSWER TO INTERROGATORY NO. 24: Ms. Lattova has photographed her husband's legs after his surgery. Please refer to Mr. Weiss' Response to Request for Production of Documents.


I do solemnly swear, under the penalties of perjury, that the foregoing Answers to Interrogatories are true and correct, to the best of my information, knowledge and belief.

SILVIA LATTOVA


Respectfully submitted,


RESNICK & SCHWARTZMAN, L.L.C.


By: /s/ Prabir Chakrabarty
Prabir Chakrabarty (D.C. Bar No. 478022,
Federal Bar No. 25524)
Robert M. Schwartzman
One East Franklin Street
Baltimore, Maryland 21202
(410) 539-6087
(410) 576-0818 (fax)

Counsel for Plaintiff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
----------------------x
ARNOLD B. WEISS et al.,:
                       :
      Plaintiffs,      :
                       :
      v.               : No. 1:07-cv-1019
                       :
NIKE USA, INC., et al.,:
                       :
      Defendants.      :
----------------------x
```

Washington, D.C.

Thursday, May 29, 2008

Deposition of

SILVIA LATTOVA

a witness, called for examination by counsel for

Defendants, pursuant to notice and agreement of

counsel, beginning at approximately 11:33 a.m., at

the offices of Regus Conference Center, 1001

Pennsylvania Avenue, NW., Washington, D.C., before

Stephen K. Garland of Anderson Court Reporting,

notary public in and for the District of Columbia,

when there were present on behalf of the

respective parties:

ANDERSON COURT REPORTING
706 Duke Street, Suite 100
Alexandria, VA 22314
Phone (703) 519-7180  Fax (703) 519-7190

EXHIBIT

B

89ccb5a3-a2f6-41b2-aa95-6f734d424793

Page 26

1  your husband's accident? I just want to make sure
2  what your claim is or what it is not.
3      A  I am -- this is not my personal claim.
4  It's my husband's claim.
5      MR. SCHWARTZMAN: Let me just object and
6  explain. As their lawyer, they hire me to
7  determine what claims may or may not be available
8  and I'm the one who has initiated those claims.
9  So I have to object in terms of when you're asking
10  Ms. Lattova what claims there are because that's
11  really a legal decision that she was not involved
12  in.
13      THE WITNESS: That's right. I'm not a
14  lawyer yet.
15      MR. SCHWARTZMAN: Hopefully in the
16  future she'll be making some decisions like that
17  for other people in other cases.
18      MR. DRAIM: Just to follow-up, the
19  reason why I ask is in answer to one of the
20  interrogatories.
21      MR. SCHWARTZMAN: Which one?
22      MR. DRAIM: Number 8.

Page 27

1      MR. SCHWARTZMAN: From which of your
2  clients?
3      MR. DRAIM: The first set directed to
4  Ms. Lattova.
5      MR. SCHWARTZMAN: First, there's a Nike
6  set and there's an Eastbay set.
7      MR. DRAIM: The Nike set.
8      MR. SCHWARTZMAN: Number 8?
9      BY MR. DRAIM:
10     Q  This asked you, Ms. Lattova, whether
11  you're claiming any loss of income of earnings as
12  a result of your husband's incident. The answer
13  which I'll just go ahead and maybe read it, says,
14  Due to the severity of Mr. Weiss's injury and
15  consequent financial loss, though Ms. Lattova
16  wanted to go to law school outside of the area of
17  the District of Columbia, her financial situation
18  prevented her from seriously considering a law
19  school outside of this area. Further, she had to
20  stay in the District of Columbia area in order to
21  care for Mr. Weiss. Ms. Lattova was on the wait
22  list for the University of Pennsylvania and

Page 28

1  Columbia, but given Mr. Weiss's loss of income and
2  his need for personal care, Ms. Lattova knew that
3  she could not afford to move, so she could not
4  pursue these educational opportunities.
5      I just wanted to follow-up on that
6  answer. Are you intending by that answer to
7  suggest that if it had not been for your husband's
8  accident that you would have gone to a different
9  law school and ended up with a different career
10  path or income?
11     A  I certainly would have ended up with a
12  different career path and most likely with a
13  different income had I gone to at that ranked law
14  school. This is the unfortunate fact. This is a
15  fact because if you graduate from Columbia
16  obviously you are going to be hired by a more
17  prestigious -- your chances of being hired by a
18  more prestigious firm and gaining -- you know, or
19  making more money in the future is just a fact of
20  life.
21     Q  Is that a claim that you're actually
22  making in this case though?

Page 29

1      A  I think that, you know, had it -- had I
2  been in a better -- had we been in a better
3  financial position I wouldn't -- I wouldn't have
4  had to take that into consideration in making my
5  decision into what law school to go. My husband
6  at the time was still not making enough money. It
7  was -- it would have been a big risk for me to
8  move outside of Washington, D.C., where I already
9  had a job which was well paid. So I couldn't have
10  -- there was no certainty that, first of all, even
11  moving outside of this area I wouldn't have been
12  able to secure a job where I could have drawn that
13  salary. Furthermore, neither of those
14  universities have evening programs, so that
15  wouldn't have been a possibility.
16      As you can understand, living for
17  example in New York is just very, very expensive
18  and unfortunately scholarships are nonexistent
19  when you go to law school.
20     Q  Did you ever get accepted at any school
21  other than George Mason?
22     A  No, I was -- did I get accepted?

89ccb5a3-a2f6-41b2-aa95-6f734d424793

Page 30

1  Actually when I was -- when I was applying
2  unfortunately knowing that what my financial were,
3  I was looking literally for the best bargain in
4  the -- in the area, for the school that -- that
5  would -- where -- where the -- where the tuition
6  rate was low but the university still was ranked
7  high enough.
8      Q   You indicated that you actually began
9  law school at George Mason in fall 2005?
10     A   Yes.
11     Q   So you applied to George Mason sometime
12 in spring 2005?
13     A   I guess.  I don't -- I don't really
14 remember when exactly I sent in the application.
15     Q   That was after your husband's accident
16 that you first applied to law school?
17     A   Yes.  First to George Mason -- I mean
18 for -- for the fall of -- I -- yeah, since he was
19 injured in 2004, I would -- this was summer, I
20 would have sent out the application, yeah, later
21 that year for the fall.
22     Q   Did you apply to any law schools before

Page 31

1  his accident in 2004?
2      A   I'm not sure because -- I'm not sure.
3      Q   When you applied to law school at George
4  Mason in 2005, at about the same time did you
5  apply to other law schools?
6      A   As I mentioned, I applied to Columbia
7  and I applied to the University of Pennsylvania,
8  and I applied to Georgetown as well.
9      Q   And George Mason?
10     A   Well, of course.  Yes.
11     Q   So that those four are the law schools
12 that you recall applying to?  Are there any
13 others?
14     A   Those are the ones.  I don't really
15 recall at this point, but, yeah, I remember, you
16 know, Columbia.  I do recall William and Mary was
17 another one.
18     Q   Which of those law schools did you
19 actually get accepted to?
20     A   I got -- as I said, I got on the waiting
21 list for Columbia and for the University of
22 Pennsylvania, and I think, I don't remember, for

Page 32

1  William and Mary, but for Columbia and
2  Pennsylvania for sure.  But since as I told you,
3  you know, they -- there was no chance for me to go
4  just because it was so expensive and the tuition
5  rates were so high, and I couldn't obviously work.
6      Q   Did you ever withdraw your application?
7      A   I did not withdraw my application but I
8  never really did anything to -- because I knew
9  that my chances of basically moving to New York
10 and living there, my husband moving with me, that
11 that was not even -- you know, it wasn't even a
12 consideration.  I could have -- I could have I
13 guess done more in order to, you know, follow-up
14 and strengthen I guess my -- my application.
15     Q   If you applied for these law schools
16 after your husband's accident, why are you saying
17 that you would not have been able to go to the law
18 school outside the area?
19     A   Why do you apply to law schools -- to as
20 many law schools as possible?  As a lawyer
21 yourself I'm sure, you apply to -- to the best,
22 the ones that have programs that you would be

Page 33

1  interested in and you would hope for the best.
2      Q   When you applied to Columbia, did you
3  expect that if you were accepted you might attend?
4      MR. SCHWARTZMAN:  I'm going to object.
5  We've been over this very narrow point so many
6  times.  At this pace we're going to be here for
7  about a month on a very simple claim.  She said
8  what her considerations were in applying and why
9  she went to school that she went to.  What more
10 could you possibly get?
11     MR. DRAIM:  State your objection, not a
12 speaking objection, but please just state your
13 objection.  We haven't gone over it.  I haven't
14 asked that.  And I'm just following-up on her
15 allegations in her interrogatories.
16     MR. SCHWARTZMAN:  She's answered it
17 probably for minutes about the law school
18 decisions.
19     MR. DRAIM:  She has not answered it.
20 Please just state your objection.  Object to form,
21 asked and answered, whatever the objection is.
22     BY MR. DRAIM:

9  (Pages 30 to 33)

89ccb5a3-a2f6-41b2-aa95-6f734d424793

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1
Not Reported in F.Supp.2d, 1998 WL 765126 (D.D.C.)
(Cite as: Not Reported in F.Supp.2d, 1998 WL 765126 (D.D.C.))

**H**Chiperas v. Rubin
D.D.C.,1998.
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.
John CHIPERAS, Plantiff,
v.
Robert E. RUBIN, Secretary of the Treasury,
Defendant.
**No. CIV.A.96-130TPJ/JMF.**

Nov. 3, 1998.

FACCIOLA.

MEMORANDUM OPINION

*1 This matter is before me to resolve three new discovery disputes.[FN1]

> FN1. It seems that these parties are always before me to resolve discovery disputes. *See. e.g.*
>
> *Chiperas v. Rubin,* Civ. A. No. 96-130, 1998 WL 531845 (D.D.C. Aug 24, 1998).

THE RAW DATA PROBLEM

In this Title VII action, plaintiff intends to call Dr. Sherry D. Molock who conducted a psychological evaluation of him. She concluded that "[b]ased on the results of this psychological evaluation, your client [i.e. plaintiff] suffered from Major Depressive Disorder that resulted from the incidents that are described in this complaint."Letter of December 29, 1997, attached as exhibit to *Defendant's Motion to Compel the Production of Plaintiff's Experts Raw Data and Test Results, to Require Plaintiff to Undergo an Independent Medical psychological Examination Or, in the Alternative to Strike Plaintiff's Expert* (hereafter "D. Mot."). Plaintiff will, of course, rely on Dr. Molock's testimony in support of his contention that the discrimination he suffered caused him severe and permanent psychological damage.

The first problem has arisen because the defendant, having noticed Dr. Molock's deposition, served her with a *subpoena duces tecum,* requiring her to produce "[c]opies of any and all raw data & test results of tests administered to Mr. John Chiperas, by you or at your direction, including any MMPI-2 Test, Draw-A-Person (DAP) Test, Rorschach, and The Weschler Adult Intelligence Scale-revised (WAIS-R)."

In response, plaintiff's counsel stated:

Pursuant to Fed.R.Civ.P. 45(c)(2)(B), we object to producing the requested materials on the grounds that they are privileged. Specifically, Dr. Molock is not ethically permitted to deliver raw data or test protocols to you or someone in your office because you are not qualified to use the information.

Letter of August 24, 1998 attached to D. Mot.

Ethical principle number 8 of the psychology profession, published by the American Psychological Association, the national accrediting body of psychologists in the United States, provides:

Psychologists make every effort to maintain the security of tests and other assessment techniques within the limits of legal mandates. They strive to ensure the appropriate use of assessment techniques by others.

*See Casebook on Ethical Principles of Psychologists,* American Psychological Association, at 109(1987).

It appears that compliance with this provision has long been viewed as prohibiting the disclosure of test materials, raw test data, or protocols to any person other than another qualified psychologist, who would then similarly be bound by this ethical principle to maintain the security of the data. Thus, the *Standards for Education and Psychological Testing,* also published by the American Psychological Association in 1985, state:

Responsibility for test use should be assumed by or delegated only to those individuals who have the training and experience necessary to handle this responsibility in a professional and technically

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.


EXHIBIT
C

Not Reported in F.Supp.2d, 1998 WL 765126 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d, 1998 WL 765126 (D.D.C.))**

adequate manner.

Since Dr. Molock might be disciplined for violating this principle and this standard, plaintiff's counsel on her behalf has made the privilege claim quoted above.[FN2]

> FN2. For an application of these standards in a particular context, see _Detroit Edison Co. v. National Labor Relations Board,_ 440 U.S. 301, 99 S.Ct. 1123, 59 L.Ed.2d 333 (1979).

**\*2** But, plaintiff, as a **party** to this action has no **standing** to **quash** a **subpoena** issued to someone who is not a **party** to the action unless the **party** claims some personal right or **privilege** with regard to the documents sought._WestsideMarrero Jeep Eagle, Inc. v. Chrysler Corporation, Inc.,_ Civ. A. No. 97-3012, 1998 WL 186705 (E.D.La. April 17, 1998); _Florida v. Jones Chemicals, Inc.,_ Civ. A. No. 90-875, 1993 WL 388645 (M.D.Fla. March 4, 1993); 9 Wright & Miller, _Federal Practice and Procedure_ § 2459 at 41 (1995). Plaintiff cannot claim any **privilege** as to the raw data; by offering the doctor as a witness he has waived any claim of doctor patient **privilege.** _First Interstate Bank of Oregon v. National Bank and Trust Company of Norwich,_ 127 F.R.D. 186 (D.Ore.1989). Thus, he lacks **standing** to **quash** the **subpoena.**

Even if he had standing, events have overtaken his claim of privilege. The defendant has now retained a psychiatrist, Dr. Christiane Tellefsen, to testify as its expert and Dr. Tellefsen has indicated that she will work with Dr. Sheri Bellow who is a licensed psychologist. Since it has not been contended that Dr. Bellow is incompetent to evaluate the raw data that defendant seeks, Dr. Moldock has no cause for concern that her surrender of the data to Dr. Bellow would violate any ethical canon of her profession. There is therefore no need to resolve whether the privilege claimed should bar the production sought by the _subpoena duces tecum._

THE INDEPENDENT MEDICAL EXAMINATION

Defendant has testified in his deposition as to the emotional distress he has suffered because of the discrimination he claims to have suffered. As just noted, he will offer in support of that claim the expert opinion of a psychologist that the defendant suffers

from a Major Depressive Disorder, which is a disorder recognized and explained by the Diagnostic and Statistical Manual for Mental Disorders, published by the American Psychiatric Association (i.e. DSM-IV (4th ed.)).[FN3] Nevertheless, plaintiff, who will premise his claim for damages on that diagnosis and his expert's testimony, resists being subjected to an examination by defendant's expert psychiatrist and the administration of diagnostic, psychological tests. Plaintiff is thus in the identical position of a plaintiff who claimed, let us say, an orthopedic injury but resisted examination by the defendant's expert orthopedist. He tries to find support for his position by claiming that there are cases in which courts have insisted that good cause for an examination sought under Fed. R. Civ. 35(a) exists only when a plaintiff in a Title VII or similar case asserts a common law claim of the intentional infliction of emotional distress and he has asserted no such claim. But, the cases cited by plaintiff do not support that assertion. In _Bridges v. Eastman Kodak Co.,_ 850 F.Supp. 216, 221 (S.D.N.Y.1994), the court, indicating the absence of any hard and fast rule, held that since plaintiff neither asserted an independent tort claim for emotional distress _nor_ "an allegation of ongoing severe mental injury," it would not order an independent medical examination. The court went on to immediately note however, that, if the plaintiff asserted the existence of an ongoing mental illness (as is certainly the situation here), a request for a Rule 35(a) independent psychiatric examination might well be appropriate.

> FN3. The illness is a serious one; DSM-IV reports that 15% of individuals affected by it take their own lives. DSM-IV at 340.

**\*3** In _O'Quinn v. New York University Medical Center,_ 163 F.R.D. 226, 228 (S.D.N.Y.1995), the court also noted the absence of an independent tort claim for emotional distress _or_ an allegation of severe emotional distress. Additionally, plaintiff's counsel had represented that plaintiff would not be seeking compensation for ongoing mental harm at trial. Thus, "because plaintiff herein will not pursue claims for ongoing severe emotional harm, defendant has not made an adequate showing that a Rule 35 examination is justified and the motion must be denied."The precise opposite is true; plaintiff will claim damages due to "severe emotional harm" and call an expert in support of that claim.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Finally, in *Lahr v. Fulbright & Jaworksi*, 164 F.R.D. 196 (N.D.Tex.1995), the plaintiff did press an independent tort claim of intentional infliction of emotional distress and there is therefore nothing in the opinion indicating what the Court would have done had it not been asserted. Moreover, and what is telling, the court found plaintiff's intention to call an expert witness in support of her claim to provide additional support for its determination that an independent examination was appropriate.

As that court indicated, such an intention militates strongly in favor of ordering such an examination. Plaintiff's expert will premise her opinion on (*inter alia* ) her examination of the plaintiff and the psychological tests that she administered. It is simply impossible for the defendant to counter that opinion without an equal opportunity to examine the defendant and to administer tests to him. Since a competent diagnosis cannot possibly occur without an evaluation of the plaintiff's mental health, his symptoms, and complaints and that evaluation is impossible without interviewing plaintiff and testing him, the requirement of Fed. R. Civ. 35(a) that good cause for ordering such an examination is easily met. The federal courts have invariably ordered such an examination when a plaintiff predicates her damage claim in whole or in part on specific psychic harm done by the defendant's actions and tenders or anticipates that she will call an expert witness in support of that claim.*E.g Hirschheimer v. Associated Minerals & Minerals Corp.*, Civ. A. No. 94-6155, 1995 WL 736901 (S.D.N.Y.1995)("[S]ince the plaintiff plans to present testimony from his own psychological expert [the defendant] must be given an opportunity to rebut any such evidence."); *Turner v. Imperial Stores*, 161 F.R.D. 89, 94 (S.D.Calif.1995)(stating that courts will order mental examinations when plaintiff alleges specific mental or psychiatric injury or disorder and offers expert testimony to support a claim of emotional distress); *Duncan v. Upjohn Co.*, 155 F.R.D. 23, 25 (D.Conn.1994)("The plaintiff intends to prove his claim at trial through the testimony of his own expert witnesses, which also constitutes good cause for permitting the defendant to conduct its own psychiatric examination of the plaintiff"); *Shepherd v. American Broadcasting Co.*, 151 F.R.D. 194, 212-213 (D.D.C.1993), *reversed and remanded on other grounds*,62 F.3d 1469 (D.C.Cir.1995); *Lowe v.*

*Philadelphia Newspapers Inc.*, 101 F.R.D. 296, 297-298 (E.D.Pa.1983).

**\*4** That these cases have reached this result is hardly surprising. If one purpose of discovery is to create equally informed parties and, in that sense, a level playing field, one is hard pressed to understand why a court would not permit an independent mental examination when the party to be examined contemplates use of an expert to substantiate her claim that she has endured psychological harm at the hands of the other party. That this result would obtain goes without saying if the plaintiff claimed a physical injury. Plaintiff suggests no reason why the result should be different merely because he claims harm to his psyche rather than, let us say, his lower back.

Plaintiff also insists, that if the independent mental examination is to be ordered, that the Court order that (1) it be limited to a certain number of hours; (2) that the expert plaintiff intends to call be permitted to attend it; (3) that it be tape recorded and (4) the tests his expert administered not be administered again. Dr. Tellefsen has indicated, however, that:

I understand that there has been a request to have Chiperas' therapist or attorney present at the interview. I am opposed to this. The presence of other persons in a psychiatric interview is intrusive and interferes with my ability to perform a standard psychiatric evaluation. The presence of another person emphasizes the adversarial nature of the situation, which may lead to the interviewee to alter their responses, thus interfering with my ability to get a true assessment of the individual. My standard practice is not to allow this in my evaluations.

Letter of October 5, 1998 from Christiane Tellesfsen, M.D., to Clair Whitaker, Esq., attached to *Defendant's Memorandum in Reply to Plaintiff's Opposition to Motion to Compel Production of Raw Data and Test Results from Plaintiff's Expert, to Order an Independent Medical Examination, or in the Alterative, to Strike Plaintiff's Expert.*

Plaintiff does not tender any countering information nor provide any reason why Dr. Tellesfen's objection should not be honored. Certainly, I utterly lack the expertise to reach a different conclusion and I will not condition the examination upon the presence of any one else during it. *See Duncan v. Upjohn Co.*,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Case 1:07-cv-01019-RJL    Document 32-4    Filed 07/16/2008    Page 4 of 6    Page 4
Not Reported in F.Supp.2d, 1998 WL 765126 (D.D.C.)
**(Cite as: Not Reported in F.Supp.2d, 1998 WL 765126 (D.D.C.))**

155 F.R.D. 23, 26 (D.Conn.1994)(rejecting request for presence of plaintiff's psychiatric expert at mental examination by defendant's expert).*Contra: Lowe v. Philadelphia Newspapers, Inc.,* 101 F.R.D. 296, 298 (E.D.Pa.1983).

As to the administration of other tests, as I read Dr. Tellesfen's letter, she contemplates administering to plaintiff tests that are in addition to ones already administered. Even if this were not so, I would be loath to interfere with a conscientious determination by a medical professional that a test should be repeated to reach a sound scientific conclusion.

I understand the parties to be ready to agree as to length of the examination, and the place, date and time for it. If necessary, I will order that, unless otherwise necessary, the examination should take no more than 6 hours.

**\*5** Finally, the courts have consistently rejected the demand that independent mental examinations be tape recorded or that a court stenographer be present. *Hirschheimer, 1995 WL 736901 at \*3;Tirado v. Erosa,* 158 F.R.D. 294, 296-298 (S.D.N.Y.1994); *Tomlin v. Holecek,* 150 F.R.D. 628, 631-632 (D.Minn.1993). As they have concluded, the presence of a stranger will necessarily inhibit the candor and frankness of the examinee's discussion of what may be intimate and embarrassing matters, such as sexual dysfunctions, dreams, or previously unarticulated desires and emotions. Weighed against that interest is the need for an accurate transcription of what occurred. But, plaintiff will be present at the examination and can report to his counsel exactly what occurred. The expert can be expected to provide a written report which will summarize the interview and describe the tests administered. There are therefore other mechanisms available to recreate what occurred. In the absence of some reason to believe that competent medical professionals can be expected to misrepresent what occurred during a psychiatric evaluation, the need for a technically perfect record yields to the potential harm to be done if the presence of a stenographer or tape records *inhibits the interviewee's discussion of what have to* be matters he might well prefer to keep to himself. I will therefore not order that the examination be tape recorded.

### PLAINTIFF'S MOTION TO STRIKE

### DEFENDANT'S EXPERT DESIGNATION

It is not Judge Jackson's practice to issue, as part of his scheduling order, a formal schedule for the designation and counter designation of expert witnesses. Instead, his order provides that depositions of adverse expert witnesses are to be permitted even though a party has filed a Fed.R.Civ.P. 26(b)(4) statement.

I issued an order from the bench, on January 15, 1998, that the parties agree upon a joint discovery plan for remaining discovery. Discovery was then scheduled to close on January 31, 1998. On the day before that deadline, the parties filed a joint discovery plan with Judge Jackson and a joint motion to extend the discovery deadline to February 27, 1998. In that motion they reported that plaintiff had designated an expert witness to testify to the issue of emotional distress and that plaintiff had sent a copy of this expert's report to defendant's counsel on December 30, 1997. Defendant was said to be intending to file a motion to strike the witness. If that motion was denied, this expert was to be deposed on February 16, 1998. Counsel expressed their understanding that the defendant was to designate a countering expert witness and that plaintiff would need an opportunity to take his deposition. They did not, however, agree on deadlines for the defendant to designate his expert and the date for that expert's deposition.

In the meanwhile, the defendant had moved that discovery be extended from January 31, 1998 to February 10, 1998. Defendant believed that plaintiff's expert would be made available on January 30, 1998, and that defendant's counsel, who was in the process of retaining a countering expert, would need five working days to have her expert submit a report.

**\*6** Judge Jackson did not rule on that motion nor did he refer it to me. Instead, on February 4, 1998, he held a status conference and ultimately extended discovery until November 30, 1998. Again, he set no specific deadlines for the designation of an expert witness by the defendant or the deposition of that witness.

Defendant's counsel, believing that Judge Jackson had extended the discovery deadline for all purposes, then began to make efforts to depose plaintiff's expert witness. Those efforts proved fruitless because of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

plaintiff's assertion that the raw data generated or used by plaintiff's expert would not be made available to defendant's counsel before or at the deposition. On September 9, 1998, defendant notified plaintiff's counsel of the name of her countering expert witness and on September 10, 1998, defendant moved to compel the production of the raw data.

Plaintiff has now cross moved that defendant's expert witness designation be stricken, in effect, precluding the defendant from calling her. Plaintiff argues that since Judge Jackson never ruled on defendant's motion to extend the discovery deadline the deadlines of Fed.R.Civ.P. 26(a)(2)(C) applied so that defendant had only 30 days from December 30, 1997 within which to designate his countering expert. Since defendant was never relieved by court order from that obligation, defendant was in default of that obligation when nine months later defendant named his countering expert on September 9, 1998. It therefore follows, according to plaintiff, that defendant should be precluded from calling that witness.

But, Judge Jackson understandably did not rule on the defendant's motion to extend the discovery deadline to February 10, 1998; he was, after all, extending the deadline for all discovery until November 30, 1998 and there would be no reason for him to segregate one aspect of discovery for specialized treatment. It was equally understandable for defendant's counsel to view the extension of the discovery deadline as relieving her of the obligation to designate her expert by February 10, 1998. Additionally, since Judge Jackson's scheduling order advises counsel that a formal schedule for the designation and cross-designation of expert witnesses will ordinarily not be issued and that depositions of experts will be permitted, whether or not 26(b)(4) disclosures are made or exchanged, counsel justifiably read that order as an indication that Judge Jackson expected counsel to agree to dates for expert depositions as they would for all other discovery matters. It is, on the other hand, illogical to say that defendant was in default of the obligation to designate his expert by February 4, 1998 when the second scheduling order obliterated all previous discovery obligations by setting new dates for the conclusion of discovery.

Additionally, plaintiff's claim of prejudice rings hollow. Plaintiff will have adequate time before

discovery closes to depose defendant's expert once that expert has completed her evaluation of the plaintiff.

*7 Finally, as to precluding the witness's testimony, I have stated on a previous occasion:

In considering whether a discovery sanction as significant as precluding a witness's testimony is appropriate, the court is obliged to consider the effect of the conduct for which that sanction is sought has had on the court's docket, whether it has prejudiced that party's opponent, and whether deterrence is necessary to protect the integrity of the judicial system. Bristol Petroleum Corp. v. Harris, 901 F.2d 165, 167 (D.C.Cir.1990). As to the last issue, however, "sanctions based only on principles of deterrence 'call for careful evaluation to ensure that the proper individuals are being sanctioned (or deterred) and that the sanctions or deterrent measures are not overly harsh.'" Bonds v. District of Columbia, 93 F.3d 801, 807-808 (D.C.Cir.1996), quoting Shea v. Dinah Construction Co., 795 F.2d 1071, 1077 (D.C.Cir.1986). Accordingly, "a discovery sanction imposed for its deterrent effect must be calibrated to the gravity of the misconduct." Bonds, 93 F.3d at 808. The central consideration in imposing any discovery sanction is the proportion between the offense and the sanction. To be just, therefore, the sanction must never be any more severe than it need be to correct the harm done and to cure the prejudice created to the other party, unless the opposing party's behavior has been so flagrant or egregious that deterring similar conduct in the future in itself warrants the sanction sought:

*2 Thus, the district court was obliged to consider whether the more severe sanction was necessary to further interests other than deterrence, or, if not, whether a less severe sanction would have been more proportionate to the nature of the District's discovery violation and its effects on the litigation.

Bonds, 93 F.3d at 808.

Walker v. District of Columbia, Civ. A. No. 96-1267, 1998 WL 429834, *1 (D.D.C. June 12, 1998).

Using that stringent standard, the remedy of precluding defendant from calling the expert witness would be a clear abuse of discretion. As I have

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-01019-RJL    Document 32-4    Filed 07/16/2008    Page 6 of 6

indicated, despite his protestation to the contrary, plaintiff has not been prejudiced by the defendant's designation of his expert witness in September since there is sufficient time to have her complete her examination of plaintiff and have her deposition taken before discovery ends on November 30, 1998. Furthermore, I certainly cannot characterize defendant's behavior as a flagrant or egregious violation of a discovery rule or any order issued by either me or Judge Jackson. To the contrary, it was justifiable for defendant's counsel to interpret these events as relieving her of the obligation to name defendant's expert by February 10, 1998. There is therefore no warrant whatsoever for the remedy plaintiff seeks.

*8 An order accompanies this memorandum

D.D.C.,1998.
Chiperas v. Rubin
Not Reported in F.Supp.2d, 1998 WL 765126 (D.D.C.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

John J. Hay (JH-3695)
Alison G. Naidech (AN-6010)
SALANS
620 Fifth Avenue
New York, NY 10020
Tel:    (212) 632-5500
Fax:    (212) 632-5555


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ARNOLD B. WEISS  and
SILVIA LATTOVA,

      Plaintiffs.

v.

NIKE, INC., A/K/A NIKE USA, INC. and
EASTBAY, INC., A/K/A EASTBAY, THE
ATHLETIC SPORTSSOURCE,

      Defendants.

---

Case Number: 1:07-cv-1019 (District of Columbia)


## RESPONSE OF SALANS TO THIRD–PARTY
## SUBPOENA ISSUED BY DEFENDANT NIKE, INC.

      Salans, a non–party to the above-captioned action, pursuant to Rule 45 of the

Federal Rules of Civil Procedure, hereby responds to the subpoena *duces tecum,* dated June 13,

2008 (the "Subpoena"), issued by defendant Nike, a/k/a Nike USA Inc. ("Nike") in connection

with the above-captioned action.



EXHIBIT
D

## General Objections

The following general objections apply to the Subpoena's requests for information and/or documents (the "Requests"):

1.      Salans objects to each Request to the extent that it seeks information and/or documents protected from disclosure by the attorney-client privilege, the attorney-work product exemption and/or any other applicable constitutional, statutory, or common law privilege.  Such information and/or documents shall not be produced in response to the Requests, and any inadvertent production or disclosure thereof shall not be deemed a waiver of any privilege with respect to such information and/or documents or of any work product protection which may attach thereto.

2.      Salans objects to each Request to the extent that it seeks information and/or documents that are solely in the possession, custody or control of Silvia Lattova, Arnold Weiss or any other person or entity other than Salans.

3.      Salans objects to each Request to the extent it seeks information and/or documents already within Nike's possession, custody or control, or seeks information or documents obtainable from some other source that is more convenient, less burdensome or less expensive.

4.      Salans objects to each Request to the extent that it seeks information and/or documents that are publicly available.

-2-

5.      Salans objects to the Requests to the extent that they are vague as to time and subject matter, overbroad, burdensome and seek information and/or documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

6.      These objections and responses, while based on a diligent search by Salans, reflect only the current state of Salans' knowledge, understanding and belief with respect to the matters raised in the Subpoena.  The objections and responses herein are not intended as, and shall not in any way be deemed, an admission or representation that certain information and/or documents exist or do not exist.  Without in any way obligating itself to do so, Salans reserves the right to modify or supplement its objections and responses to the Subpoena with such pertinent information as it may subsequently discover.

### Specific Responses and
### Objections to Document Requests

The forgoing General Objections are incorporated by reference into each of the following specific responses to the Subpoena's document requests:

### REQUEST  a)

Any and all employment records.

### RESPONSE:

The General Objections are incorporated herein as if fully set forth in response to this request.  Salans further objects to this Request on the specific grounds that the term "employment records" is vague, ambiguous, overly broad and unduly burdensome.  Without waiving any of the foregoing General Objections and specific objections subject to them, Salans will produce non-privileged responsive documents if and to the extent that such documents are

-3-

within Salans' possession, custody or control and only to the extent such documents relate to the employment of Silvia Lattova with Salans.

**REQUEST  b)**

Any employment contracts and/or agreements.

**RESPONSE**

The General Objections are incorporated herein as if fully set forth in response to this Request.  Without waiving any of the foregoing General Objections, Salans will produce non-privileged responsive documents if and to the extent that such documents are within Salans' possession, custody or control and only to the extent such documents relate to the employment of Silvia Lattova with Salans.

**REQUEST  c)**

Any and all employment evaluations and reports.

**RESPONSE**

The General Objections are incorporated herein as if fully set forth in response to this Request.  Salans further objects to this Request on the specific grounds that the term "reports" is vague, ambiguous, overly broad and unduly burdensome.  Without waiving any of the foregoing General Objections, Salans will produce non-privileged responsive documents if and to the extent that such documents are within Salans' possession, custody or control and only to the extent such document relate to the employment of Silvia Lattova with Salans.

## REQUEST d)

Any and all W2 and/or other tax documents concerning Ms. Lattova.

## RESPONSE

The General Objections are incorporated herein as if fully set forth in response to this request. Salans further objects to this request on the specific grounds that it is vague, ambiguous, overly broad, unduly burdensome and seeks information and/or documents that are neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence. Without waiving any of the foregoing General Objections and specific objections subject to them, Salans will produce non-privileged responsive documents if and to the extent that such documents are within Salans' possession, custody or control.

## REQUEST e)

Employment correspondence.

## RESPONSE

The General Objections are incorporated herein as if fully set forth in response to this request. Salans further objects to this Request on the specific grounds that it seeks information and/or documents that are neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence. Without waiving any of the foregoing General Objections and specific objections subject to them, Salans will produce non-privileged responsive documents if and to the extent that such documents are within Salans' possession, custody or control and only to the extent they relate to Silvia Lattova employment with Salans.

NewYork 1174409.2

## REQUEST f)

Employment benefits information.

## RESPONSE

The General Objections are incorporated herein as if fully set forth in response to this request. Salans further objects to this Request on the specific grounds that it seeks information and/or documents that are neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence. Without waiving any of the foregoing General Objections and specific objections subject to them, Salans will produce non-privileged responsive documents if and to the extent that such documents are within Salans' possession, custody or control and only to the extent they relate to Silvia Lattova's employment with Salans.

## REQUEST g)

All disciplinary records for Ms. Lattova.

## RESPONSE

The General Objections are incorporated herein as if fully set forth in response to this request. Without waiving any of the foregoing General Objections, Salans will produce non-privileged responsive documents if and to the extent that such documents are within Salans' possession, custody or control.

**REQUEST h)**

All attendance records for Ms. Lattova.

**RESPONSE**

The General Objections are incorporated herein as if fully set forth in response to this request. Without waiving any of the foregoing General Objections, Salans will produce non-privileged responsive documents if and to the extent that such documents are within Salans' possession, custody or control.

**REQUEST i)**

Any other reports, correspondence, and documents relating to Ms. Lattova.

**RESPONSE:**

The General Objections are incorporated herein as if fully set forth in response to this request. Salans further objects to this Request on the specific grounds that it is vague, ambiguous, overly broad and unduly burdensome and because it seeks documents protected from disclosure by the attorney-client privilege and/or the attorney-work product exemption. Salans specifically responds that any communication between Ms. Lattova and a Salans client is privileged and will not be produced. Without waiving any of the foregoing General Objections and specific objections subject to them, Salans will produce non-privileged responsive documents if and to the extent that such documents are within Salans' possession, custody or

control and only to the extent such documents relate to Silvia Lattova's employment.

Dated:       New York, New York
              July 2, 2008

                          SALANS

                          By:_____

                          John J. Hay (JH-3695)
                          Alison G. Naidech (AN-6010)
                          620 Fifth Avenue
                          New York, New York 10020-2457
                          Tel.: (212) 632-5500
                          Fax: (212) 632-5555

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 2, 2008, I caused to be served a true and correct copy of the foregoing Response of Salans to Third-Party Subpoena Issued by Defendant Nike, Inc. by First Class Mail upon the following person:

David D. Hudgins, Esq.
Hudgins Law Firm
515 King Street, Suite 400
Alexandria, VA 22314

Alison G. Naidech

-9-